**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

---

AIR BRAKE SYSTEMS, INC.,

       Plaintiff,

v.

TUV RHEINLAND OF NORTH AMERICA,
INC.,

       Defendant.

3:07-cv-01364 (CSH)

**OPINION AND ORDER**

**on Defendant's Motion for Summary
Judgment**

---

HAIGHT, Senior District Judge:

    Plaintiff Air Brake Systems, Inc. ("ABSI")[1] has sued defendant TUV Rheinland of North

America, Inc. ("TUVRNA") for breach of contract, tortious interference with contract, fraud,

negligence, and professional malpractice.   ABSI originally filed its verified complaint in the

United States District Court for the Eastern District of Michigan, invoking federal diversity

jurisdiction.[2]   In that court, TUVRNA moved for a change of venue to the District of

Connecticut, because the contract at issue specified Connecticut in separate choice-of-law and

choice-of-venue provisions.   The court granted that motion, and the case was subsequently

transferred to this judicial district.   *See* Order & Opinion Granting Defendant's Motion To

Transfer Venue [doc. #28] (E.D. Mich. Aug. 31, 2007)  (Ludington, J.).

    TUVRNA now moves under Federal Rule of Civil Procedure 56 for summary judgment,

as well as to exclude the testimony of a purported expert witness.

---

1.    While counsel's submissions in this matter use the abbreviation "ABS" or "ABS Inc.,"
the Court uses the abbreviation "ABSI" throughout to avoid confusion with anti-lock braking
systems.  Plaintiff and defendant disagree whether plaintiff's product is such a system.

2.    The parties to the complaint, as originally pled, were not diverse.  In order to maintain
diversity, plaintiff voluntarily dismissed its action as to one individual plaintiff.  *See* Order &
Opinion Granting Defendant's Motion To Transfer Venue [doc. #28] at 4 (E.D. Mich. Aug. 31,
2007)  (Ludington, J.).

I.      **Facts**

    A.      **Background**

Plaintiff ABSI manufactures a pneumatic brake system for trucks and trailers, known as the MSQR-5000.  ABSI alleges that in or around the year 2005, the company was trying to sell the MSQR-5000 "in the South African truck market."  Verified Compl. [doc. #29] ¶ 9.  After receiving preliminary approval from the relevant regulatory authorities, the company "had orders for several million dollars worth of MSQR-5000® in the country of South Africa, and had begun installation on truck trailers in South Africa.  However, a group of competing manufacturers prevailed upon the [regulatory body] to require an additional series of tests on the MSQR-5000."  *Id.* ¶¶ 12-13.  The documents provided by ABSI show that in early December 2005, following a "consumer concern," the South African regulatory body "immediately retracted" its preliminary approval for the MSQR-5000, and instructed ABSI to "retract the product from the South African market until such time that compliance to [relevant regulations] can be proven."  Pl.'s Opp'n ex. 5 [doc. #80-5] at 1, 2, 3.

In its complaint, ABSI alleges that its product had passed all the tests required for approval in South Africa, save one: the so-called "split friction test."[3]  Moreover, because facilities to perform the split friction test did not exist in South Africa, ABSI elected to perform the test in the United States, *id.* ¶¶ 14-15, perhaps because it believed that "[a]ll of the testing facilities in Europe were either owned or controlled by the Plaintiff's competitors."  Pl.'s Mem. in Opp'n [doc. #80] at 3.

-----

3.      The parties agree that a "split friction test" — also known as "split mu," "split coefficient of friction," and "split coefficient of adhesion" testing — "describes a testing condition where the surface under one wheel of a two wheel axis is at a different level of slipperiness ('mu') from that under the other wheel."  Def.'s Local Rule 56(a)(1) Statement [doc. #73] ¶ 19; Pl.'s Local Rule 56(a)(2) Statement [doc. #79] ¶ 19 (admitting same).

It was at this point — with the MSQR-5000 recently banned in South Africa, and ABSI anxious to prove its compliance as to the split friction test — that the parties in this case first encountered one another.  In early February of 2006, ABSI was referred to Link-Radlinski, a testing company with facilities in Ohio and Texas.  Link-Radlinski was not qualified to certify anything under the South African regulations, so the company referred plaintiff to TUVRNA, which had a supposed expertise in the European analogue of the South African regulation.[4]

ABSI's primary contact at TUVRNA was Lead Engineer Serge Reding.  Reding testified at his deposition that TUVRNA was an "approved authority to witness these tests, so it's our responsibility to make sure that the tests are conducted, either we conduct them ourselves or we have to make sure that they are conducted[,] according to the [regulatory] standard."  Reding Dep'n, Pl.'s Opp'n ex. 16 [doc. #80-16], at 16.

## B.    The Parties' Contract for Testing Services

Reding negotiated the price for the testing directly with ABSI's president, William E. Washington.  Washington Dep'n, Def.'s Mot. ex. M, at 48 (Feb. 11, 2008).  On or about February 14, 2006, TURVRNA provided ABSI with a "Quotation for Product Evaluation," which listed a project description and four itemized expenses.  Compl. ex. A at 1 [hereinafter "Quotation"].  The Quotation form begins with the following boilerplate text:

> Thank you for your interest in the services of TUV Rheinland of North America, Inc.  We are very interested in your business and based on the information provided, we have prepared the following *estimate*.  Unless otherwise specified, this project includes assistance with test plan preparation, review of the documentation ("information folder"), technical report and certification.  This quotation does not include travel expenses, charged at cost, unless stated otherwise.

---

4.     Link-Radlinski provided the equipment used for the testing at issue in this case, but it was not named as a defendant.

*Id.* (emphasis added).

Below the boilerplate text, specific details of the proposed "services" follow.

| Description of Product and/or System | |
|---|---|
| MSQR-5000 ABS system tests according to ECE-R 13, Annex 13, on one semi-trailer. | |
| Witness Testing, based on 2 days on-site at LRI, East Liberty, OH | $3,600 |
| Laboratory expenses, inc. vehicle prep, test track fees and driver (LRI) | $11,500 |
| Technical Report | $1,200 |
| Estimated travel expenses | $500 |
| **TOTAL** | **$16,800.00 USD** |

*Id.* Immediately below the itemized estimated costs, the form states that "Air Brake Systems Inc. hereby agrees to the terms stated in this quote." The document is signed by ABSI president William E. Washington, on February 15, 2006, and it is not signed by anyone else. *Id.*

Washington also signed, on the same day, another document captioned "Service Agreement by and between TUV Rheinland of North America, Inc. and Air Brake Systems Inc." Compl. ex. A at 2 [hereinafter "Service Agreement"].[5] The Service Agreement, too, is not signed by anyone else.

It is undisputed that the Service Agreement provided the terms of the engagement between ABSI and TUVRNA. And while the parties dispute precisely what obligations that agreement imposed, there is no dispute that the Service Agreement properly incorporates by reference at least two addenda, namely "the attached [1] General Terms and Conditions & [2] Testing and Certification Regulations." Serv. Aggr. at 1. Neither of those addenda is attached to ABSI's complaint, but they are attached to TUVRNA's Motion for Summary Judgment. *See*

---

5.     It appears that all of these documents — the Quotation, the Service Agreement, and its incorporated Terms and Conditions — were all received by ABSI as an attachment to one e-mail, dated February 14, 2006. *See* Washington Dep'n, Def.'s Mot. ex. M, at 50-51(Feb. 11, 2008).

Def.'s Mot. ex. D [doc. #70-5].   The parties also agree that "[p]rior to signing the Service Agreement, [Plaintiff's President William E.] Washington received and reviewed the 'Terms and Conditions' document referred to in the Service Agreement."   Def.'s Local Rule 56(A)(1) Statement [doc. #73] ¶ 5; *see also* Pl.'s Responses to Def.'s Local Rule 56(A)(1) Statement [doc. #79] ¶ 5 (admitting same).

The General Terms and Conditions addendum includes several provisions that are relevant to this litigation:

> 17.   Warranty and Limitation of Liability
>
> . . .
>
> 17.3.   CUSTOMER MAY NOT BRING ANY ACTION ARISING OUT OF OR IN CONNECTION WITH ANY TRANSACTION COVERED BY THESE TERMS UNLESS SUCH ACTION IS COMMENCED WITHIN SIX MONTHS AFTER THE CAUSE OF ACTION HAS ACCRUED.
>
> 17.4.   . . . THE LIABILITY OF TRNA AND THE TRNA AFFILIATES HEREUNDER IS EXPRESSLY LIMITED TO DIRECT DAMAGES INCURRED WITH RESPECT TO THE SERVICES BY TRNA.[6]   IN NO EVENT SHALL TRNA BE LIABLE TO ANY PERSON FOR ANY INDIRECT, SPECIAL, EXEMPLARY, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES INCLUDING BUT NOT LIMITED TO LOSS OF PROFITS OR GOODWILL, OR ADDITIONAL EXPENSES INCURRED, WHETHER PURSUANT TO A CLAIM IN CONTRACT, TORT OR OTHERWISE AND WHETHER IN AN ACTION FOR BREACH OF WARRANTY OR OTHERWISE.
>
> . . .
>
> 19.   Governing Law and Jurisdiction; Place of Performance
>
> 19.1.   The construction and validity of these Terms shall be governed by the laws [of] the State of Connecticut, USA, without

---

6.      "TRNA" is an abbreviation of defendant's name.   Defendant's counsel in their submissions use the abbreviation "TUVRNA," as does the Court in this opinion.

giving effect to its conflict of laws rules, regardless of where any order was placed or filed, the place of performance of the Services or delivery of reports or where any other act or performance has occurred.

19.2.   All Services provided by TRNA shall be deemed to be provided in Newtown, Connecticut, USA.  The Customer agrees to the exclusive jurisdiction of the federal and state courts located in the State of Connectcut, with respect to the adjudication of any dispute arising out of or in  connection with the provisions of the services, the Service Agreement or these Terms.

. . .

19.4.   In the event of any legal action, the prevailing party shall be entitled to recover from the other party all costs, expenses and reasonable attorney's fees, expert witness fees, and any other costs incurred to bring or defend such action.

Def.'s Mot. ex. D [doc. #70-5] at 2.

## C.    The Testing on March 7, 2006

Pursuant to the Service Agreement, TUVRNA observed a test of the MSQR-5000 system on March 7, 2006, in the presence of ABSI personnel.  The mechanics of the test were administered by non-party Link-Radlinski, and the test was performed at a facility and track owned by another non-party, Transportation Research Company.

In opposing summary judgment, ABSI emphasizes the existence of several factual questions regarding which exact tests were performed, and which ones were not performed.  *See* [doc. #80] at 3.

The Plaintiff contends that the Defendant did not perform a proper pre-test planning and allowed the brakes to be tested out of the presence of Plaintiff.  It is also contended that the Defendant did not conduct a split-mu testing as required[,] but tested the brakes on a surface that was a lower coefficient of friction than that allowed by the regulations.

*Id.*; *see also id.* at 9 (ABSI also asserts that TUVRNA breached the Service Agreement when it "refused, or failed, to provide assistance with the test plan preparation and review of the documentation as required by the 'Quotation For Product Evaluation.'").    But despite its misgivings about pre-test planning, ABSI allowed the test on March 7, 2006, to go forward.

The parties also have conflicting characterizations of what happened that day on the testing track.  TUVRNA contends that during the first two test runs, Reding observed wheels locking up.[7]  Reding stated in his deposition:

> The tests to be performed were out of this test series that we have to do, we pretty much picked the most straightforward ones, which are stops on a dry surface out at 40 kilometers [per hour].
>
> At that time, the vehicle, the MSQR 5000-equipped trailer obviously showed that it did not meet the requirements.

Reding Dep'n at 49 (date not provided).  Similarly, Reding testified:

> Q     Were you going to test it on a wet surface before Mr. Engler [(an ABSI-affiliated engineer from South Africa)] asked you to?

---

7.     ABSI admits that certain wheels may have locked up, but it claims they did so because the test was performed incorrectly.  One explanation of the wheel lock-up given by ABSI is that the trailer's brakes were applied by means of a bypass valve, instead of a driver.  ABSI contends that the valve applied too much pressure to the trailer brakes.  TUVRNA contends that the tests were run according to the regulatory protocol, as evidenced by Reding's statements during his deposition.  Reding testified to his strong belief that the regulations required him to use a valve to brake the trailer, because the regulation required him to brake the trailer separately from the tractor, and because the brakes were required to receive enough pressure so that the "cycling" described in the regulation could be observed.  Reding Dep'n at 30, 41-42, 43-44.

Similarly, ABSI contends that from the beginning, the road surface upon which the braking was tested was improperly doused with water to make it more slippery.  *See* Washington Dep'n at 95.  Reding claims that the first two test runs were performed on dry asphalt.  Reding Dep'n at 49.  But Reding agrees that the test track was doused at a later point, after the first two tests indicated that the MSQR-5000 had failed the test, because other ABSI-related personnel wanted to take advantage of the testing opportunity.  Reding Dep'n at 66.  Reding believed that wetting the test track surface was the only way to achieve the coefficient of adhesion (slipperiness, or "mu") that was prescribed by the regulation.  Reding Dep'n at 22.

> A     No, because after the first two stops, we all agreed that there was no way for the system to meet the requirements of EC 13.
>
>        So as far as we were concerned, you know, the certification tests were over.
>
>    . . .
>
> Q     . . . You never got to the split friction test anyway?
>
> A     No.
>
> Q     It was never even done because you said after the first two, they said forget it?
>
> A     Yes, we basically agreed that it wouldn't make sense to continue on with the tests.

Reding Dep'n at 66, 72.

Washington's account of the test day differs substantially from Reding's. According to Washington, the parties actively disagreed about whether the testing should be abandoned. During his deposition, Washington testified that Reding said several things that caused Washington to become enraged:

> And I said, I'm going to kick his fucking ass, man, I said, this guy is ripping us off. And I got extremely angry, and Carl grabbed me, and Dave grabbed me, and they said, Bill, you go over here and sit down. I said, No, man, we spent $8,000 on this thing and this guy is wetting the track down, he's not supposed to do that. . . . And they got me to go and get in the car, get calmed down, and I sat there and I said, This is bullshit, I'm sick of this crap. And I said, I don't even want to have anything to do with it. . . .
>
> Then [Reding] came and told us, he told me, he said, Well, because your wheels locked up, you have to – we have to fail you. And I was silent, you know, because I knew that it was a bunch of nonsense, and in my anger I said, Is this guy – is the testing being done using the equipment to supply it with air pressure, or is the driver doing it? . . . I said to the driver, I want you to run this test one more time, and I want you to use the foot brake . . . .

-8-

> So Mr. Reding reluctantly agreed to let him do that. He took the truck around, he used the foot brake, the truck went straight and stopped in half the distance, and the wheels did not lock up on that wet, slick track.

Washington Dep'n, Def.'s Mot. ex. M, at 97 (Feb. 11, 2008). Washington testified that after a couple other conversations, he said "Fine, let's just get out of here," and "Let's just forget about this, I just want to get this thing over with and get out of here." *Id.* at 98. Later in his deposition, when describing Reding's allegedly false statements, Washington once more described his disappointment at the way the test had been conducted, and his desire to have it go forward, but nevertheless concedes that he allowed the testing to cease:

> Q    Okay. Any other statement that Mr. Reding made to you that you believe was false?
>
> A    That we failed the test.
>
> . . .
>
> A    No, Mr. Reding told me that he was saving me money by not going forward with the test, and there was no reason to do it.
>
> Q    And did you agree?
>
> A    No, I did not agree.
>
> Q    You wanted the testing to go forward?
>
> A    I wanted a legitimate test, period.
>
> Q    Did you inform Mr. Reding that you wanted to continue the testing that day on March 7, 2006?
>
> A    No, I did not.

Washington Dep'n at 171-72 (Feb. 11, 2008).

Two days later, on March 9, 2006, Reding provided ABSI with the only data it ever received regarding the March 7, 2006 tests. *See id.* at 114.

-9-

Q        Okay.  After the March 9, 2006 correspondence from Mr
         Reding to you, you had no other conversations with
         anybody from TUV, correct?

A        I did not.

Q        Do you know if Mr. Perazzola [(the ABSI-affiliated
         engineer who organized the test)] had any conversations
         with TUV after the testing?

A        I don't believe he did.

Q        What steps did Air Brake Systems take to get, obtain
         another ECE-R13 certification after March 7, 2006?

A        We didn't take any other steps.

Q        You know there are other companies that perform ECE-
         R13 certifications, correct?

A        Yes, I do.

Q        And what is the reason that you didn't attempt to contact
         one of those agencies to obtain an ECE-R13 certification?

A        It's going to be a little bit of a lengthy answer.

*Id.* at 120-21.  After a lengthy discourse on the history of the brake industry, Washington

described that "[t]here are no test facilities that I could go to that I will be given a fair shake; it

will end up being the exact same thing that I experience today with TUV." *Id.* at 123.  Later in

his deposition, Washington described the only other contact he had made with Reding:

Q        After the testing on March 7, 2006 with Mr. Reding, you
         asked Mr. Reding to do you a couple favors, correct?

A        That's right.

Q        And what were those favors?

A        If he had the names of the people who were sitting on the
         Technical Committee of the United Nations.

Q        Mr. Reding sent you a response to your request?

-10-

> A        Yes.
>
> Q        Did you have any other correspondence with Mr. Reding
>          after that?
>
> A        No.

*Id.* at 135.

ABSI's Verified Complaint was filed on September 20, 2006 — which is approximately

six months and two weeks after March 7, 2006.[8]

## II.    Discussion

### A.    Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and

the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving

party bears the burden of demonstrating that no genuine issue exists as to any material fact.  *See*

*Celotex Corp v. Catrett*, 477 U.S. 317, 323-25 (1986).

---

8.    Depending on how one defines "six months," the time elapsed between the test date and the filing date (197 days) could be described as anything between six months and eleven days and six months and seventeen days.  But it is clearly more than six months after the date of testing.

ABSI argues the existence of a "disputed material fact" with respect to "whether or not some testing or modifications of the Plaintiff's truck was performed at times other than when the Plaintiff's personnel were present."  Pl.'s Local Rule 56(a)(2) Statement [Doc. #79] ¶ 11.  But all of the exhibits submitted by both parties on this motion for summary judgment indicate that the alleged testing outside ABSI's presence occurred *before* the tests ABSI observed on March 7, 2006.  Thus, any such unauthorized testing could not justify starting the contractual period of limitation on a later date.

Similarly, ABSI claims that certain "testing reports which were required by the Service Agreement were not provided until after the stated date."  *Id.*  But the record clearly reveals that whatever test data *was* transmitted was sent on March 9, 2006.  *See* Washington Dep'n at 114. That date is still beyond the six-month limitation period.

To the extent ABSI wishes to argue that the testing, or the data transmitted, were incomplete and that TUVRNA's breach is thus somehow a "continuing course of conduct," that argument is rejected in Section II.B.2., *infra*.

Materiality is determined by "[t]he substantive law governing the case." *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citation omitted). "In assessing the record to determine whether there is a genuine issue to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Gorzynski v. JetBlue Airways Corp.*, --- F.3d ----, No. 07-4618-cv, slip op. at 13, 2010 WL 569367, at *6 (2d Cir. Feb. 19, 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

However, the party opposing summary judgment "may not rely merely on allegations or denials," Fed. R. Civ. P. 56(e)(2), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## B.     The Contractual Statute of Limitations

As described *supra*, the Service Agreement contains an explicit six-month period of limitation, which is significantly shorter than the relevant statutory periods.[9] ABSI argues that this limitations period has not started running, and that ABSI's cause of action "is still accruing[,]

---

9.      There is no dispute that ABSI's claims are timely under Connecticut's relevant statutes of limitation. Claims for breach of contract must be brought within "six years after the right of action accrues." Conn. Gen. Stat. § 52-576(a) (limiting period to bring suit upon "any contract in writing"). Claims sounding in tort, such as Counts II through V (for tortious interference, fraud, negligence, and malpractice) must be brought within three years "from the date of the act or omission complained of." Conn. Gen. Stat. § 52-577.

because the Defendant was required by the contract to provide a Technical Report and it has yet to comply with this requirement." Pl.'s Resp. [doc. #80] at 6-7. ABSI also argues that the six-month limitation period specified in the Service Agreement "is *per se* unreasonable under the laws of the State of Connecticut." *Id.*

In order to determine whether this action is time-barred by the contract's time-limitation provision, the Court must first determine whether such provisions are permitted at all under Connecticut law. If they are permissible, then the Court must determine the date when ABSI's causes of action would have accrued as a matter of law, and whether there is any genuine issue of material fact as to when they accrued as a matter of fact.

### 1.    Validity of Contractual Provision Providing Shorter Limitations Time To Bring Suit

Since at least the mid-1800s, federal jurisprudence has recognized that parties to a contract may require a specific period of time within which to assert their respective claims, and that longer statutes of limitation do not prevent such agreements as a matter of principle. *See, e.g.*, *Riddlesbarger v. Hartford Ins. Co.*, 74 U.S. 386, 390 (1868) ("The policy of these statutes [of limitation] is to encourage promptitude in the prosecution of remedies. They prescribe what is supposed to be a reasonable period for this purpose, but there is nothing in their language or object which inhibits parties from stipulating for a shorter period within which to assert their respective claims."). In *Riddlesbarger*, the Supreme Court cited as precedent a federal decision in Connecticut that held such a provision valid and not contrary to law or policy. *See Cray v. Hartford Fire Ins. Co.*, 6 F. Cas. 788, 790-91, 1 Blatchford 280 (C.C.D. Conn. 1848) ("Although the condition is subsequent,[10] it is, if lawful, as operative and binding as a condition precedent;

---

10.    While *Cray* held this was a valid "condition subsequent," cases since then have clarified that all contractual "conditions" operate in the same way. *See, e.g.*, *Gingras v. Avery*, 878 A.2d

and that it is lawful, as well as a very essential part of the contract, we cannot doubt.") *aff'g* 6 F. Cas. 786, 788 (C.C.D. Conn. 1847).

Likewise, the state courts of Connecticut have held such provisions valid and enforceable for more than a century, holding that a contractual provision that limits the time within which a party can bring suit is valid, does not operate as a statute of limitations, and is not susceptible to exceptions that excuse suits which are untimely under the statute of limitations. *See, e.g.*, *Bocchino v. Nationwide Mut. Fire Ins. Co.*, 716 A.2d 883, 885-87 (Conn. 1998) (holding that the State's savings statute, Conn. Gen. Stat. § 52-592(a),[11] did not apply to a "*contractual* limitation period, irrespective of whether that period was required by a statutory form for an insurance policy," because a contractual limitation period was not a "statute of limitations" (emphasis in

___

404, 408 n.4 (2005) ("The modern law of contracts does not recognize a substantive difference between conditions precedent and subsequent."); 31 Williston on Contracts § 38:9, "Conditions Subsequent" (4th ed.) ("[A] provision that suit must be brought within a stated period which is reasonable is commonly contained in insurance policies, bills of lading, and similar contracts. The expiration of this time divests a duty of immediate performance previously existing." (footnotes omitted)).

11.    Conn. Gen. Stat. § 52-592 provides in pertinent part:

> **Accidental failure of suit; allowance of new action.** (a) If any action, commenced within the time limited by law, has failed one or more times to be tried on its merits because of insufficient service or return of the writ due to unavoidable accident or the default or neglect of the officer to whom it was committed, or because the action has been dismissed for want of jurisdiction, or the action has been otherwise avoided or defeated by the death of a party or for any matter of form; or if, in any such action after a verdict for the plaintiff, the judgment has been set aside, or if a judgment of nonsuit has been rendered or a judgment for the plaintiff reversed, the plaintiff, or, if the plaintiff is dead and the action by law survives, his executor or administrator, may commence a new action, except as provided in subsection (b) of this section, for the same cause at any time within one year after the determination of the original action or after the reversal of the judgment.

original)); *Monteiro v. Am. Home Assur. Co.*, 416 A.2d 1189, 1190 (Conn. 1979) ("Since a provision in a fire insurance policy requiring suit to be brought within one year of the loss is a valid contractual obligation, a failure to comply therewith is a defense to an action on the policy unless the provision has been waived or unless there is a valid excuse for nonperformance; and such a condition requiring suit to be brought within one year does not operate as a statute of limitations. . . .  This condition is a part of the contract so that it controls the rights of the parties under the contract and, hence, such rights must be governed by the rules of law applicable to contracts." (citations omitted)); *Chichester v. N.H. Fire Ins. Co.*, 51 A. 545 (Conn. 1902) ("The provision in the policy sued upon requiring an action to be brought 'within twelve months next after the fire' does not operate as a statute of limitations.  It is a part of the contract.  The rights of the parties flow from the contract, and must be governed by the rules of law applicable to contracts.  Such a provision in a contract of insurance is valid and binding upon the parties.  The insurer's promise to indemnify is not absolute, but modified by the promise of the insured to commence his action within 12 months.  Upon failure to perform this condition, the liability of the insurer under the contract ceases to exist; but the remedy of the insured for any cause of action he may have under the contract is not affected, and is governed by the statute of limitations.  The performance of the condition to bring suit within the specified time . . . may be excused upon the existence of such facts as, by the law of contract, will excuse the performance of such a condition." (citations omitted)).

        i.       **Validity of Time-Limitation Provision Outside the Insurance Context**

ABSI first attempts to distinguish most of the cases cited by TUVRNA by emphasizing that such cases arose in the context of a suit to enforce coverage under an insurance policy.  Pl.'s

Mem. [doc. #80] at 7.  That is an accurate characterization, so far as it goes, but it does not

diminish the breadth of the general contract-law proposition that those cases endorse.  Indeed, in

a recent case on the Connecticut Superior Court's complex litigation docket, the court dismissed

exactly that argument and held a specific period of repose to be valid and enforceable, stating

that "the underlying logic of the *Chichester* line of cases should be applicable to any contract

action."  *State v. Lombardo Bros. Mason Contractors, Inc.*, 980 A.2d 983, 994 n.1 (Conn. Super.

Ct. 2009).

Similarly, the general force of the proposition that parties may contract for a shorter time

limit on lawsuits is also not diminished by the existence of a law that, specifically in the

insurance context, sets a minimum period of one year to bring an action for coverage on an

insurance policy.[12]

---

12.      Conn. Gen. Stat. § 38a-290 provides:

> **Time limitation on suits and arbitration claims.**  No insurance company doing business in this state shall limit the time within which any suit shall be brought against it or any claim shall be submitted to arbitration on (1) a fidelity or surety bond to a period less than three years from the time when the loss insured against occurs; (2) a construction performance bond to a period less than three years from the date on which the principal last performed work under the contract; (3) a construction payment bond to a period less than three years from the date on which the claimant last performed work or supplied material for which the claim is made; and (4) all other policies to a period less than one year from the time when the loss insured against occurs.  This section shall not apply to suits and arbitration claims under the uninsured or underinsured motorist provisions of a motor vehicle insurance policy.

There is obvious logic behind specifying a particular floor for the limitations period in certain types of contracts, like construction contracts or insurance contracts.  New construction typically does not immediately manifest its inadequacies, and insurance contracts are typically "contracts of adhesion" made between parties with obvious disparities in bargaining power.

And although *Monteiro* and *Bocchino* arose in the context of a fire insurance policy, where Connecticut law requires the one-year contractual limitations period by statute,[13] the Connecticut Supreme Court did not limit its holding to such policies.  Instead, the Court's rationale endorses the general proposition that such conditions amount to "a valid *contractual* obligation."  *Monteiro*, 416 A.2d at 1190 (emphasis added).

In sum, I conclude that the laws of Connecticut permit parties to make such provisions a valid and binding part of their contracts.  That is also the trend in the vast majority of the states.  *See, e.g.*, 14 Williston on Contracts § 42:12 ("Provision limiting time for bringing action"); 31 Williston on Contracts § 79:10 ("Specification of limitation period in contract"); B.H. Glenn, Annotation, Validity of Contractual Time Period, Shorter than Statute of Limitations, for Bringing Action, 6 A.L.R. 3d 1197 (1966 & Supp. 2010).

### ii.    *Per Se* Unreasonableness of Six-Month Limitations Period

ABSI's second argument against the validity of the six-month limitation period is that it is "*per se* unreasonable under the laws of the State of Connecticut."  [Doc. #80] at 7.  ABSI points out that the only non-insurance case cited by TUVRNA upheld a limitation period of one year, but TUVRNA "did not cite any cases where a less than one (1) year limitation period was found to be reasonable."  [Doc. #80] at 8.

---

13.     Conn. Gen. Stat. § 38a-307 sets the standard form for a fire insurance policy in Connecticut, which includes the following provision: "Suit.  No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity . . . unless commenced within twelve months next after inception of the loss."  In *Monteiro* and *Bocchino*, the Connecticut Supreme Court held that the limitation period set by this provision creates an obligation in *contract*, and is not a "statute of limitations," even though the provision is required by statute.  *See Monteiro*, 416 A.2d at 1190; *Bocchino*, 716 A.2d at 885.

From this silence in the caselaw, ABSI concludes that "[i]t is obvious that the public policy in Connecticut is that any contractual statute of limitations less than one (1) year, unless specifically authorized by statute, is unreasonable and unenforceable." *Id.*

To the contrary, that proposition is far from obvious, and ABSI cites no other authority to support it, nor can this Court find any.  Indeed, the Supreme Court has noted that a six-month contractual limitation period is "not [] unreasonable." *Texas & Pac. Ry. Co. v. Leatherwood*, 250 U.S. 478, 481 (1919) (plurality opinion); *see also Mo., Kan., & Tex. Ry. Co. v. Harrison Bros.*, 227 U.S. 657, 671-73 (1913) (holding that "[a] provision requiring suit to be brought within ninety days is not unreasonable"; and enforcing that provision in a contract involving interstate commerce, even though the limitation period was shorter than that permitted by state law, because the state law was preempted by the "general common law").

Six months is more than enough time for an injured party to solicit the advice of counsel and to draft and file a complaint.  Indeed, a six-month limitation period seems entirely appropriate if at least one party to the contract places a high value on finality with respect to potential legal claims.  In cases like this, where the contract is made between sophisticated commercial parties with no obvious disparities in bargaining power, the Court must assume that the parties considered the existence of the provision in their risk calculus and factored it into the final, bargained-upon contract price.

It is worth noting here that TUVRNA drafted the language of the Service Agreement. Viewed in its totality, that agreement clearly characterizes the service that TUVRNA intended to provide as a narrow and limited one.  Even if TUVRNA had known how much ABSI had riding

on the test results, the clear function of the Service Agreement was to disclaim any liability for whatever consequences might follow as a result of the services TUVRNA provided.

The ultimate thrust of ABSI's argument may be simply that enforcing the limitations provision creates an unduly harsh result.  But that result is certainly no harsher than those described in the Connecticut cases which serve as precedent for the enforcing the provision.  In *Monteiro*, the Connecticut Supreme Court affirmed a lower court's holding that a plaintiff's failure to bring suit within one year was fatal under the insurance policy's one-year limitations provision, even though the plaintiff's delay in bringing suit was occasioned by the tragic illness and subsequent incompetence of plaintiff's counsel.  Similarly, in *Bocchino*, the Connecticut Supreme Court, voting 3-2, affirmed the inapplicability of the State's savings statute to a contractual clause limiting the time for suit, where the prior timely suit had been dismissed due to a "as a result of a computer generated error."  716 A.2d at 889 (Berdon, J., dissenting).

### 2.      When the Cause of Action Accrued

The final argument ABSI offers against the period-of-limitations clause is that TUVRNA has not completed performance of its obligations under the Service Agreement, and therefore, ABSI's cause of action has not yet "accrued" within the meaning of that clause.  ABSI contends that a "technical report" is one of the deliverables under the contract, and that until TUVRNA performs on its obligation to deliver such a report, "the contractual statute of limitations cannot begin to run."  Pl.'s Mem. at 7.  In other words, ABSI argues that the contractual limitation period must be tolled as to any claim about improper testing on March 7, 2006, due to TUVRNA's continuing breach in its failure to deliver a test report.

Although ABSI cites no authority for this argument, it is true that Connecticut permits its six-year statute of limitation for contract claims to be tolled where the breach constitutes a

-19-

"continuing course of conduct."  *Compare West Haven v. Commercial Union Ins. Co.*, 894 F.2d 540, 545 (2d Cir. 1990) (tolling the statute of limitations for contract claims because "Commercial Union's breach of its duty to defend was continuous and thereby did not commence running the limitations period until the duty to defend was complete"), *with Beckenstein v. Potter & Carrier, Inc.*, 464 A.2d 18, 23 (Conn. 1983) (holding that statute of limitations for contract claims was not tolled where defendants and the plaintiffs had contracted for the "'performing of a specific, definable act,' i.e., the construction of a roof").  This exception is "conspicuously fact-bound."  *Grey v. Stamford Health Sys., Inc.*, 924 A.2d 831, 839 (Conn. 2007).

In the case at bar, the period of limitation arises from contract, and not by statute. Because the continuing-course-of-conduct exception is a judicially created doctrine to toll *statutes* of limitation, it is doubtful whether it should apply in this case.  As previously noted, periods of limitation that the parties create by *contract* are not susceptible to statutes and doctrines that toll the relevant period of limitation that arises by *statute*.  *See, e.g.*, *Monteiro*, 416 A.2d at 1190 ("This condition is a part of the contract so that it controls the rights of the parties under the contract and, hence, such rights must be governed by the rules of law applicable to contracts.").

However, assuming without deciding that the continuing-course-of-conduct exception is applicable to this contractual limitation period, there is no genuine issue of fact as to the nature of TUVRNA's obligation to produce a report: it was a one-time obligation, not a continuing one, and it was predicated on the completion of the tests required by the regulation.  Thus, the limitation period cannot be tolled by TUVRNA's failure to deliver a report.  In this conclusion, I

am guided by the Connecticut Supreme Court's recent rejection of an almost identical argument. In *Bellemare v. Wachovia Mortg. Corp.*, 931 A.2d 916 (Conn. 2007), the plaintiff had sued her mortgagor for its failure to timely execute and deliver a release upon satisfaction of her mortgage.[14]  To rebut the bank's statute-of-limitations defense, the plaintiff argued that the bank's "continued failure to execute and deliver the release" was a "continuing course of conduct" that tolled the statute.  931 A.2d at 920 n.7.  The court disagreed, stating that the bank's "failure to provide the appropriate release constituted a single omission and not an ongoing or recurring wrongful act."  *Id.*

Besides, the argument that the claim for breach has not yet accrued is specious, because it ignores ABSI's own contribution to TUVRNA's failure to produce a report.  It is clear from the record, described *supra*, that both parties ultimately deemed the test a failure — even if they did so for different reasons — and neither party wished to resume testing at a later date.  Without cooperating to complete the tests that were required by the relevant regulation, ABSI could hardly expect TUVRNA to deliver any further "report" on tests that were not performed, let alone expect TUVRNA to issue the regulatory "certification" that would satisfy the authorities in South Africa.

Having dispensed with any suggestion that ABSI's claim is "still accruing," I am left only to decide whether there is any genuine issue of material fact as to the date on which ABSI's breach-of-contract claim did accrue.  Under Connecticut law, a cause of action for breach of contract accrues "at the time the breach of contract occurs, that is, when the injury has been

---

14.      In its principal holding, the Connecticut Supreme Court held that the bank's failure to perform a duty *prescribed by statute* amounted to a tort, very similar to slander of title.  Although plaintiff's claim would have been timely under the statute of limitations for a breach of contract, it was untimely under the shorter statute of limitations applicable to claims sounding in tort.

inflicted." *Beckenstein*, 464 A.2d at 22.   However, if any difficulty arises in determining when cause or right of action accrued, "the true test is to establish the time when the plaintiff first could have successfully maintained an action" for breach.  *Engelman v. Conn. Gen. Life Ins. Co.*, 690 A.2d 882, 886 n.7 (Conn. 1997); *see also W. S. Rockwell Co. v. Lindquist Hardware Co.*, 125 A.2d 173, (Conn. 1956) ("It is fundamental that the legal injury caused by a breach of contract is sustained at the time the contract is broken, even though the actual damage resulting from the breach is not received until a later time." (citation omitted)).

On the record before me, I find there is no genuine question of material fact as to when plaintiff's contract claims accrued.  Any reasonable jury would find that ABSI suffered its injury, and could have maintained an action for breach, either immediately upon the day of testing (March 7, 2006), or two days later (March 9, 2006) when Reding sent Washington the data from the minimal testing that was accomplished.   The difference between those two dates is not material, because either date puts the filing date on ABSI's complaint beyond the six-month limitation period.

Because plaintiff's action is untimely under the contractual period of limitation, all of its claims sounding in contract must be dismissed.

**C.    Application of Contractual Period of Limitation to Claims Sounding in Tort**

Having determined that the time-limitation clause operates as a condition precedent to suit, and that ABSI's failure to comply extinguishes any right to relief sounding in contract, I must now determine whether the clause also works to extinguish ABSI's claims that sound in tort.

For the reasons that follow, I find that all of ABSI's so-called "tort" claims are actually contract claims in disguise.  As such, they are controlled by the contractual time limitation

clause.  In the alternative, I also hold that the language of the time-limitation provision is broad enough to amount to a limitation-on-liability clause, which works as a release of any tort claims ABSI might intend to raise after a six-month window has passed.

### 1. Operation of Time Limitation To Bar Tort Claims Where Such Claims Spring from Contract

The Connecticut Supreme Court has said that in cases where "the liability of [defendant] to the plaintiff, if any, is based on principles of tort law," then "the plaintiff may not convert that liability into one sounding in contract merely by talismanically invoking contract language in his complaint."  *Gazo v. City of Stamford*, 765 A.2d 505, 515 (Conn. 2001).[15]  *Mutatis mutandis*, ABSI may not convert TUVRNA's contract liability into one sounding in tort merely by "talismanically" phrasing its counts in terms of duties, breaches of those duties, causation, and injury.

Of course, a plaintiff may suffer injuries and incur damages as a result of a defendant's conduct that breaches duties of contract and duties of law.  In such situations, a plaintiff is free to allege both theories of recovery, but under Connecticut law, a plaintiff may not recover the same damages twice under two theories; indeed, it would be "improper for the court to submit both [theories] to the jury."  *Bonan v. Goldring Home Inspections, Inc.*, 794 A.2d 997, 1003 (Conn. App. 2002).  Although the standard for submitting a count to the jury is different than the standard I apply on this motion for summary judgment, it is worth noting that ABSI has alleged only one set of damages for all its claims — $50,000 in out-of-pocket expenses related to the testing, and $10 million for lost profits in South Africa.  Compl. at 7-13.

---

15.      The attempted tort-to-contract conversion arises more frequently, because under Connecticut law, contract claims are susceptible to a six-year statute of limitations, while tort claims must be raised within three years.  *See* note 9, *supra*.

### i.      All of TUVRNA's Duties Spring from the Contract

As the Connecticut Supreme Court said succinctly in *Gazo*, "[a]n action in contract is for the breach of a duty arising out of a contract; an action in tort is for a breach of duty imposed by law."  765 A.2d at 515.

In Count II, for tortious interference with contract, the complaint alleges that TUVRNA had actual knowledge of ABSI's contract in South Africa, and that TUVRNA's "failure to perform the proper test, and its improper performance of the tests that it did perform, was an intentional, improper interference inducing or causing a breach or termination" of ABSI's advantageous business relations in South Africa.  Compl. ¶¶ 42-43.  But besides its criticism of TUVRNA's attempt to perform its duties under the contract, ABSI alleges not one single additional action or omission by TUVRNA that would constitute tortious interference with advantageous business relations.[16]  At its core, Count II alleges a malicious breach by TUVRNA, but assumes that if TUVRNA had faithfully performed its obligations under the contract, ABSI would not have suffered any harm.  As such, it is fundamentally a claim for breach of a contractual obligation.

In Count III, for fraud, ABSI hopes to recover damages from TUVRNA under a theory of *respondeat superior*.  According to ABSI, Serge Reding either intentionally or negligently misrepresented that he "was obligated to apply water to the testing surface in order to perform

---

16.      In his deposition, Washington states his belief that TUVRNA made improper disclosures to the South African Bureau of Standards.  *See* Washington Dep'n at 175-76.  But the entire basis for that belief rests on Washington having learned that Reding traveled to South Africa at some point after testing the MSQR-5000.  Washington readily admits he has no actual knowledge of whether Reding said anything to the SABS about the MSQR-5000.  *See id.*  Nothing is alleged to have happened in South Africa after the test date to suggest that the MSQR-5000 would ever be reinstated as an approved device in that country.  Thus, ABSI has not uncovered sufficient material facts with which to prove the requisite element of causation in a claim of tortious interference, even if the allegation about Reding's travel were true.

the testing . . . in accordance with [the regulation]," when in fact the water was not required by the regulation.[17]   *Id.* ¶ 46.   ABSI claims it relied to its detriment "by allowing TUV to complete the test rather than rescheduling the test with another testing facility."   *Id.* ¶ 50.   Once again, this is essentially an allegation that if TUVRNA had correctly performed its obligations under the contract — if it had conducted the test according to what the regulation actually required — it would not have suffered any harm.   Again, it is fundamentally a claim that Serge Reding breached one of his obligations under the contract.

In Count IV, for negligence, the contortion of claims is even more evident, when ABSI alleges that "Reding owed a duty to conduct the test of the MSQR-5000® in accordance with ECE-R 13, Annex 13."   *Id.* ¶ 54.   ABSI claims he breached that duty, causing it to suffer damages.   But any such duty to conduct tests in a specific way must have sprung from the *contract*, and thus any claim for breach of that duty must sound in contract, not in tort.

Finally, in Count V, for professional malpractice, ABSI alleges that Reding "owed a duty to conduct the test of the MSQR-5000® in accordance with the standard of practice or care within the engineering specialty."   *Id.* ¶ 59.   ABSI makes a conclusory allegation that Reding breached that duty, without saying how he did so.   *Id.* ¶ 60.   But again, whether or not Reding had any additional "duties" under Connecticut law stemming from his professional employment as an engineer (in another state), the gravamen of ABSI's complaint is still his perceived failure to perform in a manner that was required not by his profession, but by the *contract*.

---

17.      ABSI alleges that Reding made "certain representations . . . including, but not necessarily limited to" the one described.   *Id.* ¶ 46.   But fraud must be pleaded with particularity, and besides, ABSI's papers in this motion have not highlighted any portions of the record that might suggest any other misrepresentations by Reding.

Ultimately, this is a case where all of the duties that defendant is alleged to have breached arise from the contract.  For that reason alone, they must be limited by the contractual time period of limitation.  *See Zieba v. Middlesex Mut. Assur. Co.*, 549 F. Supp. 1318, 1323 (D. Conn. 1982) ("[I]t is obvious the alleged tortious conduct of the insurer arises out of its obligations under the provisions of the policy. . . . These are merely two different consequences which may flow from a violation of the same duty imposed upon the insurer by contract. Therefore, the limitation period for suit as set forth in the policy controls.").

### 2.   Validity of Contractual Time Limitation To Release Claims Sounding in Tort

The broad wording of the contract unambiguously expresses the intent of the parties to bar "*any* action arising out of or in connection with any transaction covered by these terms unless such action is commenced within six months after the cause of action has accrued."  Terms & Conditions § 17.3 (italic emphasis added; uppercase emphasis removed).  In the context of a contract claim, this clause clearly operated as a necessary "condition" upon liability.

But in the tort context, a party may not place a "condition" upon a liability that is imposed by law.  Thus, in the tort context, we speak instead of whether a contract has properly "released" or "discharged" the party of its liability for breach of a legally imposed duty.

In *B&D Assocs. v. Russell,* 807 A.2d 1001 (Conn. App. 2002), the appellate court held that Connecticut law "does not favor contract provisions which relieve a person of his own negligence."  *Id.* at 1005 (citation omitted).  However, the court noted that such provisions have been upheld "under proper circumstances." *Id.*  A blanket release is only valid if it appears "plainly and precisely that the limitation of liability extends to negligence or other fault of the party attempting to shed his ordinary responsibility." *Id.* at 1006 (citation omitted).

-26-

By and large, if such is the intention of the parties, the fairest course is to provide explicitly that claims based on negligence are included.  That does not mean that the word 'negligence' must be employed for courts to give effect to an exculpatory agreement; however, words conveying a similar import must appear.

When applied to contracts to which the parties are sophisticated business entities, the law, reflecting the economic realities, will recognize an agreement to relieve one party from the consequences of his negligence on the strength of a broadly worded clause framed in less precise language than would normally be required, though even then it must evince the unmistakable intent of the parties.

*Id.* (internal quotation marks, citations, and ellipses omitted).[18]

---

18.      One year after *B&D Associates*, the Connecticut Supreme Court staked out a clear position with respect to consumer contracts, requiring that any release of tort liability must explicitly use the word "negligence" in order to be valid.  *Hyson v. White Water Mountain Resorts of Conn., Inc.*, 829 A.2d 827, 832 (Conn. 2003).  But in a footnote, the Connecticut Supreme Court recognized that contracts between sophisticated business parties are different, citing *B&D Associates*, and stating that "[w]e do not today decide whether such language suffices to release landlords from liability for their negligence in the context of commercial leases."  *Id.* at 830 n.6.

In a subsequent opinion, the Connecticut Supreme Court held that releases of negligence liability in the consumer recreational context of snowtubing were void as a violation of public policy, even if the language of the release explicitly refers to "negligence."  *See Hanks v. Powder Ridge Rest. Corp.*, 885 A.2d 734, 747 (Conn. 2005).  An even later opinion extends the same holding to horseback riding.  *See Reardon v. Windswept Farm, LLC*, 905 A.2d 1156, 1163-64 (Conn. 2006).  Both of these opinions, however, rested their holding on a variety of factors to assess whether a contract violates public policy.  A key factor in both of those assessments was that "the agreement at issue is a standardized adhesion contract, offered to snowtubers on a 'take it or leave it' basis, and without the opportunity to purchase protection against negligence at an additional, reasonable fee; and [] the defendants had superior bargaining authority."  *Hanks*, 885 A.2d at 745 n.9; *see also Reardon*, 905 A.2d at 1164 ("[T]he defendants' release constituted a classic contract of adhesion.").

In the case at bar, there is no doubt that TUVRNA's Terms & Conditions were drafted in advance by TUVRNA.  But there was no evidence that they were provided on a "take it or leave it" basis.  ABSI could have submitted a counter-proposal, either by striking certain clauses or by drafting its own proposed terms.  Furthermore, ABSI was contracting to obtain a specialized service for a considerable sum of money, which suggests that it was probably not in a weaker bargaining position.  In short, there is no evidence in the present record to suggest that the Service Agreement was "not subject to the normal bargaining process of ordinary contracts."

-27-

Like the court in *B&D Associates*, I find that the provision at issue here clearly works to release TUVRNA of its liability in tort for claims "arising out of or in connection with" the testing transaction, so long as "customer" has not brought suit on such claims within six months. The provision is clear and unambiguous, and as such, its intent can be discerned as a matter of law, without creating a question of fact that would otherwise be for the jury to resolve. *B&D Assocs.*, 807 A.2d at 1005. ABSI has not brought any facts to the Court's attention that would suggest it was in a weaker bargaining position when it agreed to these terms. And because the provision does not release any claims — either in contract or tort — until six months after they have accrued, most of the public policy considerations underlying a release of tort liability simply do not apply, because ABSI could have enforced such liability for a reasonable period of time. Indeed, this clause operates less like a preemptive release and more like a limitation on tort liability: by electing to file suit more than six months after its tort claims accrued, ABSI effectively waived those claims.

These conclusions are further buttressed by case law and scholarly commentary.

For example, in *Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44, 46 (2d Cir. 1993), the Second Circuit affirmed a district court decision that limited a defendant's liability in tort to claims under a contractual "Warranty," where the warranty liability was itself time-limited to one year after purchase and installation of defendant's fire alarm system. *Id.* at 46, 48-50. Applying Connecticut law, the Second Circuit held that such a limitation-on-liability clause made between two sophisticated commercial parties was generally enforceable and valid. *Id.*; *see also Western Alliance Insurance Co. v. Wells Fargo Alarm Servs., Inc.*, 965 F. Supp. 271, 275-76 (D. Conn. 1997) (granting defendant's motion for summary judgment on the basis of exculpatory clause in

*Hanks*, 885 A.2d at 745.

alarm services contract, as well as for plaintiff's failure to "demonstrate any factual support whatsoever" for tort claims "outside of the conclusory allegation[s] in its complaint").

Similarly, the Restatement (Second) of Torts provides that "[a] cause of action for a tort may be discharged by . . . (b) satisfaction, or a release or contract not to sue." *Id.* § 900(1) (1979); *see also* Restatement of Torts § 900(1)(b) (1939). In the accompanying commentary, the authors of the Restatement explain:

> At common law a cause of action is not discharged by a contract not to sue the tortfeasor, often called a covenant not to sue. This contract, however, operates as an equitable defense *without limitation of time if it is so agreed or, if limited, during the period agreed upon*. If the promise is made conditional upon the performance by the other of an act such as payment, the contract is not a defense if the act is not done. . . . *The rules that apply to a contract not to sue for a breach of contract apply to a contract not to sue for a tort.*

Restatement (Second) of Torts § 900 cmt. b (emphases added). Clearly, in the case at bar, the time period is limited, and the "period agreed upon" is any time after six months from the date any such action accrues. The terms of this particular limitation-on-liability clause are more than reasonable. Furthermore, ABSI has not made any factual allegations or legal arguments that might militate against applying this clause to its tort claims in particular.

## III.   Conclusion

For the reasons given, defendant TUVRNA's Motion for Summary Judgment [doc. #70] is hereby GRANTED, and all of plaintiff's claims are hereby DISMISSED, either for failure to meet a necessary condition as required by contract, or because the claims have been discharged and released for failure to adhere to the those terms. Effectively, ABSI's claims are untimely, and that threshold issue is dispositive of all of its claims. Hence, I do not reach TUVRNA's remaining arguments for summary judgment.

The Clerk is instructed to close the file.

It is SO ORDERED.

Dated: New Haven, Connecticut
March 30, 2010

            /s/ Charles S. Haight, Jr.
            Charles S. Haight, Jr.
            Senior United States District Judge